UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

PUBLIC SERVICE ELECTRIC AND
GAS COMPANY,

                **Plaintiff,**

v.

COOPER INDUSTRIES, LLC,

                **Defendant.**

Civ. No. 21-13644 (KM) (JBC)

**OPINION**

**<u>KEVIN MCNULTY, U.S.D.J.:</u>**

      This is an action by plaintiff Public Service Electric and Gas Company ("PSE&G") to recover environmental cleanup and removal costs that it incurred as a result of historical discharges of hazardous substances at a property it owns in Newark. Defendant Cooper Industries, LLC ("Cooper") is a prior owner of the property. Cooper acquired the property when it purchased J. Wiss & Sons Co. ("Wiss"), which operated a manufacturing facility there for over a century. Cooper continued to operate the facility for several years before taking its manufacturing operations elsewhere. PSE&G seeks to hold Cooper liable not only for the environmental damage caused by its own manufacturing activities, but also for the damage caused by Wiss, based on a theory of successor liability. Both parties have moved for partial summary judgment on the issue of successor liability only.

      For the reasons set forth below, PSE&G's motion for partial summary judgment (DE 35)[1] is **GRANTED** and Cooper's motion for partial summary judgment (DE 36) is **DENIED**.

---

[1]      Certain citations to the record will be abbreviated as follows:

1

## I.    Background

PSE&G is the current owner of property located at 13-45 Littleton Avenue and 29-53 Eleventh Avenue, Newark, New Jersey ("the Site"). (Pl. St. ¶1; Def. Resp. ¶1.) Prior to PSE&G's purchase of the Site, it operated as a manufacturing facility for the production of scissors, snips and shears for nearly one hundred years, beginning in or around 1887 and continuing in some capacity until 1985. (Pl. St. ¶2; Def. Resp. ¶2.) Defendant Cooper, then known as Cooper Industries, Inc., acquired the Site from Wiss on December 1, 1976. (Pl. St. ¶3; Def. Resp. ¶3.) Cooper's purchase of the Site was part of a larger acquisition of the business and assets of Wiss (hereinafter referred to as the "Acquisition"). (Pl. St. ¶4; Def. Resp. ¶4.)

*Wiss's operations at the Site*

Wiss acquired a portion of the Site in 1887. (Pl. St. ¶8; Def. Resp. ¶8.) That year, Wiss built a two-story factory on the Site to house its scissors, snips and shears operations. (Pl. St. ¶20; Def. Resp. ¶20.) Wiss purchased the remainder of the Site overtime as its business expanded. (Pl. St. ¶9; Def. Resp. ¶9.) In 1906, the first power drop hammers for hot forging steel were installed at the Site. (Pl. St. ¶22; Def. Resp. ¶22.) This new method process "made

---

Compl. = PSE&G's complaint (DE 1)

Def. Mot. = Cooper's memorandum of law in support of its motion for partial summary judgment (DE 36)

Pl. St. = PSE&G's statement of undisputed material facts (DE 35-2)

Def. St. = Cooper's statement of undisputed material facts (DE 36-2)

Pl. Opp. = PSE&G's memorandum of law in opposition to Cooper's motion for partial summary judgment (DE 39)

Def. Opp. = Cooper's memorandum of law in opposition to PSE&G's motion for partial summary judgment (DE 38)

Pl. Resp. = PSE&G's response to Cooper's statement of material facts not in dispute (DE 39-1)

Def. Resp. = Cooper's response to PSE&G's statement of material facts not in dispute (DE 38-1)

Def. Reply = Cooper's reply memorandum of law in support of its motion for partial summary judgment (DE 41)

Agr. = 1976 asset purchase agreement between Wiss and Cooper (DE 35-4, Ex. 4.)

scissors and shears virtually indestructible." (Pl. St. ¶23; Def. Resp. ¶23.) By 1976, Wiss had become recognized as the "premier brand name in quality scissors and snips." (Pl. St. ¶10; Def. Resp. ¶10.)

*The Acquisition*

Prior to 1967, Cooper was a "one-product, one-market" company, with its sole business consisting of supplying compressors for the oil and gas industry. (Pl. St. ¶30; Def. Resp. ¶30.) At the time, Cooper's U.S. operations were organized into three operating groups, one of which was The Cooper Group. (Pl. St. ¶34; Def. Resp. ¶34.)

In 1967, Cooper adopted a diversification plan to expand into new markets by acquiring companies that were leaders in their product markets. (Pl. St. ¶31; Def. Resp. ¶31.) Among the markets Cooper decided to expand into was the market for hand tools, including scissors, shears, and snips. (Pl. St. ¶32; Def. Resp. ¶32.) Cooper did not manufacture any of those products prior to the Acquisition. (Pl. St. ¶36; Def. Resp. ¶36.)

In 1976, Cooper identified Wiss as a company that would be "an excellent addition to The Cooper Group." (Pl. St. ¶37; Def. Resp. ¶37.) After Cooper's Board of Directors unanimously approved the proposal, Cooper and Wiss executed an "Agreement for the Acquisition of the Business and Assets of J. Wiss & Sons Co. by Cooper Industries, Inc." ("the Agreement"). (Pl. St. ¶¶42-43; Def. Resp. ¶¶42-43.) The Agreement was executed on or around November 8, 1976, and the closing date of the Acquisition was December 1, 1976. (Pl. St. ¶¶43, 59; Def. Resp. ¶¶43, 59.) The purchase price was based on the net book value of the company. (Def. St. ¶5; Pl. Resp. ¶5.)

Among other things, the Agreement provided for the sale of "all of [Wiss]'s business, contracts, assets, rights and properties (except for the consideration to be paid by Cooper hereunder), controlled by, related to or used in the business conducted by [Wiss] wherever situated." (Pl. St. ¶¶11, 56; Def. Resp. ¶¶11, 56.) Cooper paid a purchase price of $10,500,000; the shareholders of Wiss did not take any shares in Cooper. (Def. St. ¶23; Pl. Resp. ¶23.)

3

Accordingly, as of December 1, 1976, Cooper acquired all of Wiss's real property, including the Site; Wiss's personal property, including all of its machinery and equipment; and Wiss's intellectual property, including the right to use the corporate name "J. Wiss & Sons Co." (Pl. St. ¶¶48-50; Def. Resp. ¶¶48-51.) Cooper also assumed "all liabilities and obligations of Wiss" which were (a) reflected on the Closing Balance Sheet and "incurred in the ordinary course of [Wiss's] business," unless expressly excluded; or (b) were "to be performed after 12:01 A.M. on the Closing Date under the contracts, agreements, leases, commitments or contingent claims set forth in the Disclosure Schedule," unless expressly excluded." (Pl. St. ¶52; Def. Resp. ¶52.) Liabilities described in the Closing Balance Sheet included the following categories of costs: notes, mortgage, and accounts payable; accrued expenses and sundry liabilities; accrued taxes; and pensions. (Def. St. ¶12; Pl. Resp. ¶12.) Liabilities that were expressly not assumed by Cooper included tax liabilities, liabilities that did not arise from Wiss's normal operations, liabilities covered by Wiss's insurance, liabilities of Wiss to its shareholders, and others. (Pl. St. ¶53; Def. Resp. ¶53.)

In addition, Wiss agreed to "use its best efforts to maintain its relationship with its employees, suppliers, customers, governmental agencies and others having business relations with [Wiss] so that they [would] be preserved at and after the Closing Date." (Pl. St. ¶45; Def. Resp. ¶45.) Wiss also agreed to carry on its business in "substantially the same manner" until the date of closing. (Pl. St. ¶46; Def. Resp. ¶46.) Finally, the Agreement prohibited Wiss from engaging in any activity competitive with the hand-tool manufacturing business for a period of five years. (Def. St. ¶22; Pl. Resp. ¶22.)

*Post-Acquisition activities of Wiss and Cooper*

On December 1, 1976, Wiss changed its name to Fredken Corp. ("Fredken"). (Pl. St. ¶12; Def. Resp. ¶12.) Fredken did not manufacture scissors, shears or snips after the Acquisition; indeed, there is no evidence that Fredken conducted any manufacturing operations after the Acquisition. (Pl. St. ¶¶14-15; Def. Resp. ¶14-15.) The last annual report that Wiss (later known as

4

Fredken) filed with the State of New Jersey was on January 1, 1976. (Pl. St. ¶17; Def. Resp. ¶17.) In 2015, the State of New Jersey revoked the corporate status of Fredken for failure to pay annual reports. (Pl. St. ¶18; Def. Resp. ¶18.) There is no evidence that Fredken continues to exist. (Pl. St. ¶19; Def. Resp. ¶19.)

Cooper, meanwhile, manufactured scissors, snips and shears at the Site beginning in 1976 and continuing into the 1980s. (Pl. St. ¶59; Def. Resp. ¶59.) Cooper used the machinery and equipment that it acquired from Wiss, including the power drop hammers used in the hot drop-forging process that Wiss pioneered in 1906, to conduct its operations at the Site. (Pl. St. ¶¶61-62; Def. Resp. ¶¶61-62.) There is no evidence that Cooper used different machinery or equipment at the site than that which it acquired from Wiss. (Pl. St. ¶63; Def. Resp. ¶63.) In a regulatory submission filed with the New Jersey Department of Environmental Protection ("NJDEP") in December 1985, Cooper identified Wiss as the previous owner of the Site and described Wiss's operations as the "Same" as Cooper's operations. (Pl. St. ¶82; Def. Resp. ¶82.)

Under the terms of the Agreement, "the services of substantially all the present employees of [Wiss] [would] continue to be available . . . to Cooper . . . after the Closing Date." (Def. St. ¶5; Pl. Resp. ¶5.) Wiss employed approximately 900 people prior to the Acquisition, divided into three functional areas: administration, marketing and manufacturing. (Pl. St. ¶64; Def. Resp. ¶64.) Upon the closing of the Acquisition, Cooper terminated two Wiss family members who served as officers of the company, but there is no evidence in the record that Cooper terminated any other Wiss employee at that time. (Pl. St. ¶¶67-68; Def. Resp. ¶¶67-68.) Paul Richards, the president of Wiss at the time of the Acquisition, became Vice President and General Manager of Site operations for Cooper, and Cooper retained a handful of other Wiss employees in management positions. (Pl. St. ¶¶69-70; Def. Resp. ¶¶69-70.) Richards headed operations at the Site for one year following the Acquisition. (Def. St. ¶27; Pl. Resp. ¶27.) Cooper also assumed the pension plans for Wiss employees, as well as Wiss's 1973 collective bargaining agreement with the

local union, which at that time covered 674 hourly employees. (Pl. St. ¶¶64-65; Def. Resp. ¶¶64-65.)

*Cooper's environmental cleanup submissions to NJDEP*

By the end of 1985, Cooper had moved all of its on-Site operations to a different location and all production at the Site had ceased. (Pl. St. ¶81; Def. Resp. ¶81.) In 1988, Cooper sold the Site. (Def. St. ¶29; Pl. Resp. ¶29.)

Prior to the sale, Cooper submitted to NJDEP an application for review under the New Jersey Environmental Cleanup Responsibility Act ("ECRA"). (Pl. St. ¶89; Def. Resp. ¶89.) As part of this process, Cooper investigated the Site, subject to the oversight of NJDEP, and the NJDEP case manager identified conditions at the Site requiring remediation. (Def. St. ¶¶30-33; Pl. Resp. ¶¶30-33.) In particular, certain underground storage tanks ("USTs") were identified as requiring remediation during Cooper's investigation. (Def. St. ¶34; Pl. Resp. ¶34.)

*Cooper's use of the Wiss name and trademark*

During and after the time Cooper manufactured scissors, shears and snips at the Site, it enforced the Wiss trademark and made use of the Wiss brand name in advertising materials, job postings, and annual reports to shareholders.

On June 7, 1984, Cooper filed a complaint with the U.S. International Trade Commission against various domestic and foreign companies alleging trademark infringement and unfair methods of competition related to certain compound action metal cutting snips that were "manufactured by Wiss and marketed by The Cooper Group." (Pl. St. ¶83; Def. Resp. ¶83.) Cooper also published catalogs of products manufactured at the Site using the Wiss® trademark, noting that the "name Wiss has been synonymous with fine quality shears and scissors since 1848." (Pl. St. ¶104; Def. Resp. ¶104.) In 2000, Cooper published its "Cooper Tools Hand Tools Catalog" on its Cooper Tools website. In the section on Wiss® products, Cooper stated that "[s]ince 1848, Wiss has manufactured a quality line of cutting tools." (Pl. St. ¶105; Def. Resp. ¶105.) In available annual reports to shareholders from 1983 through at least

6

2004, Cooper identified its Wiss products as among the company's major product lines. (Pl. St. ¶106; Def. Resp. ¶106.)

*PSE&G's later discovery of environmental contamination*

The Site changed owners several times before PSE&G purchased it in 2012. (Def. St. ¶38; Pl. Resp. ¶38.) In 2013, while conducting demolition activities at the Site, PSE&G discovered a 5,000-gallon UST and former oil sump. (Def. St. ¶¶39, 42; Pl. Resp. ¶¶39, 42.) This tank and oil sump were apparently buried beneath one of the buildings at the Site, and it is undisputed that Cooper did not discover their existence during its own investigation. (Def. St. ¶35; Pl. Resp. ¶35.)

In its complaint, PSE&G alleges that although Cooper removed five USTs it had discovered as part of its environmental cleanup, it "left significant quantities of contaminated soil behind and failed to fully and properly remediate the former tank locations." (Compl. ¶¶29, 33.) PSE&G discovered this soil contamination beneath one of the buildings at the Site during its demolition. (Compl. ¶¶46, 47.) Additionally, PSE&G alleges that Cooper failed to identify and remove the 5,000-gallon UST and oil sump, as well as other USTs at the Site, which were associated with Wiss's industrial operations at the site. (Compl. ¶¶34-35.) According to PSE&G, these tanks continued to discharge hazardous fuel oils into the subsurface for decades after Cooper had sold the Site. (Compl. ¶39.)

## II.   Procedural history

PSE&G commenced this action in July 2021. (Compl.) PSE&G seeks contribution under the New Jersey Spill Act, *see* N.J. Stat. Ann. § 58:10-23.11, a declaratory judgment declaring that Cooper is liable for PSE&G's cleanup and removal costs, and damages for Cooper's alleged negligence and unjust enrichment.

In August 2022, both parties moved for summary judgment on the issue of successor liability. (DE 35, 36.) Each party opposed the other's motion, and filed a reply brief in support of its own. (DE 38, 39, 40, 41.)

### III.    Legal standards

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)).

The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

### IV.    Discussion

I begin with some background on corporate-successor liability. "The general rule of corporate-successor liability is that when a company sells its assets to another company, the acquiring company is not liable for the debts and liabilities of the selling company simply because it has succeeded to the ownership of the assets of the seller." *Lefever v. K.P. Hovnanian Enterprises,*

*Inc.*, 160 N.J. 307, 310 (1999). There are, however, exceptions to this general rule. The four traditional exceptions apply where "(1) the successor expressly or impliedly assumes the predecessor's liabilities; (2) there is an actual or *de facto* consolidation or merger of the seller and the purchaser; (3) the purchasing company is a mere continuation of the seller; or (4) the transaction is entered into fraudulently to escape liability." *Id.* (Citing 15 William & Fletcher, *Cyclopedia of the Law of Corporations* § 7122, nn. 9–15 (1990)). The second and third exceptions are often treated in unison, with courts analyzing the same set of factors to determine whether a particular transaction amounts to a *de facto* merger or mere continuation. *Woodrick v. Jack J. Burke Real Est., Inc.*, 306 N.J. Super. 61, 73 (App. Div. 1997).

New Jersey courts, like those in several other jurisdictions, have adopted a fifth exception to the general rule of successor non-liability in products liability cases. Under the so-called "product-line exception," a successor corporation may be held strictly liable for defects in a predecessor's products if the successor "acquires all or substantially all the assets of the predecessor corporation for cash and continues essentially the same manufacturing operation as the predecessor corporation." *Ramirez v. Armsted Industries, Inc.*, 86 N.J. 332, 335 (1981) (quotation omitted).

In *Department of Transportation v. PSC Resources, Inc.*, 175 N.J. Super. 447, 467 (Law Div. 1980), the court concluded that a product-line exception, similar to that in products liability cases, was warranted in the context of environmental torts. Adopting the test from *Ramirez*, *PSC Resources* held that "where 'the successor corporation acquires all or substantially all the assets of the predecessor corporation for cash and continues essentially the same operation as the predecessor corporation . . .,' the successor incurs liability for the damages resulting from any discharges of hazardous substances by its predecessor." 175 N.J. Super. at 467 (quoting *Ramirez*, 171 N.J. Super. at 278). The New Jersey Supreme Court has essentially ratified the *PSC Resources* test, applying it in an environmental tort case involving a successor liability

9

claim. *See State Dept. of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 503 (1983).

PSE&G argues that summary judgment is appropriate on the issue of successor liability because the record shows that Cooper is liable as the successor to Wiss under both the *de facto* merger/mere continuation test and the *PSC Resources* product-line test. Cooper, on the other hand, argues that the Court should grant partial summary judgment in its favor, as the evidence demonstrates that neither the *de facto* merger/mere continuation test nor the *PSC Resources* test is satisfied.

### A. Assumption by contract

I first address Cooper's threshold argument that PSE&G may not use successor liability to circumvent the agreement between Cooper and Wiss, which did not provide for the transfer to Cooper of Wiss's environmental liabilities. Relying on the Third Circuit's opinion in *SmithKline Beecham Corp. v. Rohm & Haas Co.*, 89 F.3d 154 (3d Cir. 1996), Cooper argues that the intent of the contracting parties should control, and that the Agreement demonstrates that neither it nor Wiss intended for Cooper to assume liability for Wiss's environmental torts. (Def. Reply 3.)

The buyer's express or implied assumption of the seller's liabilities, however, is only one exception to the traditional rule of corporate successor non-liability. That is, even where the contract does not evidence an express or implied intent to transfer liabilities of the seller to the buyer, the other exceptions to the traditional rule may still apply, effectuating that result.

In *SmithKline*, the dispute was over who would bear the environmental clean-up costs attributable to the seller's predecessor corporation, which no longer existed. Under the terms of the agreement between the buyer and seller, the seller would indemnify the buyer for all of its pre-closing liabilities. The question was whether the *de facto* merger doctrine could be applied, such that the pre-closing liabilities of the seller included those of its predecessor corporation. *SmithKline*, 89 F.3d at 163.

10

The Third Circuit held that it would "not use the *de facto* merger doctrine to circumvent the parties' objective intent." *SmithKline*, 89 F.3d at 163. The Court observed that the parties, both of which were sophisticated corporations, had "drafted an indemnification provision that excluded successor liability." *Id.* Accordingly, the *de facto* merger doctrine could not be used to alter the effect of that provision.

Cooper notes that there was an indemnification provision in the Agreement between Wiss and Cooper, as well as a warranty by Wiss that no material liabilities existed which had not been disclosed. (Def. Mot. 17.) But unlike in *SmithKline*, the question here is not how to apportion clean-up costs as between the parties to the relevant contract—here, Cooper and Wiss. Wiss is not a party to this action, and, more critically, PSE&G was not a party to the 1976 Agreement. To hold that the 1976 Agreement is binding upon PSE&G and prohibits consideration of other corporate-successor liability doctrines would render those doctrines meaningless. It is therefore not improper to consider whether, under some other doctrine, Cooper may be liable for Wiss's environmental torts as its corporate successor.[2]

### B. *De facto* merger or mere continuation

"In determining whether a particular transaction amounts to a de facto consolidation or mere continuation, most courts consider four factors: (i) continuity of management, personnel, physical location, assets, and general business operations; (ii) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (iii) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted

---

[2]     Cooper also relies on *McKee v. Harris-Seybold Co., Div. of Harris-Intertype Corp.,* 109 N.J. Super. 555 (Law. Div. 1970), *aff'd*, 118 N.J. Super. 480, 288 A.2d 585 (App. Div. 1972), *and abrogated by Ramirez v. Amsted Indus., Inc.,* 86 N.J. 332, 431 (1981). In addition to the fact that *McKee* was overturned by *Ramirez*, the court in *McKee* did not hold that the language of the contract between the buyer and seller prohibited consideration of whether the exceptions to the general rule of corporate-successor liability could apply. Indeed, the court evaluated whether any of the exceptions to the general rule applied under the circumstances of the transaction.

continuation of the business of the predecessor; and (iv) continuity of ownership/shareholders." *Woodrick*, 306 N.J. Super. at 73. In New Jersey, "'[n]ot all of these factors need be present for a de facto merger or continuation to have occurred.'" *Id.* at 74. (Quoting *Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 73 (3rd Cir. 1993)). New Jersey courts have "adopted a broader standard of successor liability that deemphasizes the continuity of shareholder interest" in particular. *Berg Chilling Systems, Inc. v. Hull Corp.*, 435 F.3d 455, 462 (2006). *See Woodrick, supra* at 75 ("[T]he more modern view of New Jersey law . . . no longer require[es] continuity of shareholder interest."). The crucial inquiry under New Jersey law "is whether there was an 'intent on the part of the contracting parties to effectuate a merger or consolidation rather than a sale of assets.'" *Woodrick, supra* at 74 (quoting *Luxliner*, supra at 73.)

Here, it is apparent that there was no continuity of shareholder interest, as Cooper paid for the acquisition entirely in cash and did not transfer any stock to former shareholders of Wiss. (Def. St. ¶23; Pl. Resp. ¶23.) Because continuity of stock ownership is no longer considered a prerequisite under the *de facto* merger/mere continuation test, I will turn to the three *Woodrick* factors listed above.

The first factor—continuity of management, personnel, physical location, assets, and general business operations—weighs in favor of finding a *de facto* merger. Pursuant to the 1976 Agreement, Cooper obtained all of Wiss's assets, including its real property, personal property, and intellectual property. (Pl. St. ¶¶11, 56; Def. Resp. ¶¶11, 56.) Cooper utilized these assets to carry on the general business operations of Wiss; it manufactured scissors, snips and sheers using the machinery and equipment it had acquired from Wiss, and it did so in the same physical location as the Wiss operations. (Pl. St. ¶59; Def. Resp. ¶59.) With respect to continuity of personnel, there is no evidence that Cooper terminated any of the 900 former Wiss employees aside from two Wiss family members who had served as officers of the company.  (Pl. St. ¶¶64, 67-68; Def. Resp. ¶¶64, 67-68.)

Whether there was continuity of management is a closer call, but I ultimately conclude that there was. It is undisputed that Cooper retained the former President of Wiss, Paul Richards, as Vice President and General Manager of Site Operations. (Pl. St. ¶¶69-70; Def. Resp. ¶¶69-70.) It is also undisputed that Cooper retained other Wiss employees in management positions at the Site, including Plant Manager, Assistant Plant Manager, Plant Engineer, Plant Supervisor, Plant Supervisor/Production Manager, Plant Superintendent, Director of IT, and Corporate Controller. (Pl. St. ¶70; Def. Resp. ¶70.)

According to Cooper, what is missing is continuity of *upper* management, as Wiss corporate officers did not serve as Cooper corporate officers. Here, Cooper relies on the Third Circuit's opinion in *Berg Chilling*, where the Court found that this prong of the *de facto* merger test was not satisfied because no member of the seller corporation's board of directors served on the buyer corporation's board of directors, and the two members of upper management who stayed on were given either an honorary position or a position as a temporary consultant with no authority to bind the buyer company. 435 F.3d at 469–70.

In *U.S. v. General Battery Corp.*, however, the Third Circuit held that there was continuity of management where three senior executives of the seller corporation—the president, executive vice president, and vice president of manufacturing— "remained active in supervising the [battery manufacturing] plant" that had been sold to the buyer corporation. 423 F.3d 294, 305-06 (3d Cir. 2005). This case is not on point with either *Berg Chilling or General Battery*, but is more akin to the latter. A substantial number of Wiss's plant management employees, as well as Wiss's former president, "remained active in supervising the plant." *General Battery*, *supra. See also Woodrick*, 306 N.J. Super. at 76-77 (continuity of management existed where signatory to asset purchase agreement "assumed management over the business operations" that were sold to the buyer corporation). Moreover, the evidence suggests that there

13

were only three senior-level managers at Wiss prior to the Acquisition. In addition to then-President Richards, two members of the Wiss family served as Executive Vice President-Treasurer and Vice President-Marketing. (DE 35-4 Exhibit 7.) As discussed, the record shows that Cooper terminated those two Wiss family members and retained the only other corporate officer, as well as eight individuals in middle-management roles. This evidence is sufficient to demonstrate some, though far from total, continuity of management.[3]

The Agreement itself also evidences an intent to continue Wiss's business through Cooper. Per the Agreement, Wiss was obligated to "use its best efforts to maintain its relationship with its employees, suppliers, customers, governmental agencies and others having business relations with [Wiss] so that they [would] be preserved at and after the Closing Date." (Pl. St. ¶45; Def. Resp. ¶45.) Wiss also agreed to carry on its business in "substantially the same manner" until the date of closing. (Pl. St. ¶46; Def. Resp. ¶46.) These terms demonstrate an intent for the Wiss enterprise to continue running smoothly as a prelude to a seamless transition to Cooper, presumably so that Cooper would not be impaired in its effort to carry on the Wiss manufacturing business just as before.

I will jump ahead to the third prong of the *de facto* merger/mere continuation test—assumption of obligations ordinarily necessary for the uninterrupted continuation of normal business operations—as it is easily satisfied here. Pursuant to the 1976 Agreement, Cooper assumed "all liabilities and obligations of Wiss" which were (a) reflected on the Closing Balance Sheet and "incurred in the ordinary course of [Wiss's] business," unless expressly

---

[3]     Cooper points out that Richards only stayed on with Cooper for a short period of time. (Def. Mot. 21.) But Richards's personal decision to leave Cooper after one year does not bear on whether the corporations themselves intended to effectuate a merger rather than a sale of assets. In addition, Cooper points out that the Agreement did not expressly provide that Cooper would retain Wiss's employees or management. (*Id.*) In practice, however, that is substantially what occurred. As demonstrated by the reasoning in both *General Battery* and *Berg Chilling*, what actually occurred following an acquisition, separate and apart from what the parties formally agreed to, constitutes significant evidence of the parties' intent.

excluded; or (b) were "to be performed after 12:01 A.M. on the Closing Date under the contracts, agreements, leases, commitments or contingent claims set forth in the Disclosure Schedule," unless expressly excluded." (Pl. St. ¶52; Def. Resp. ¶52.) The liabilities that were expressly excluded were limited to discrete matters, such as tax liabilities, liabilities that did not arise from Wiss's normal operations, and liabilities covered by Wiss's insurance. (Pl. St. ¶53; Def. Resp. ¶53.) By contrast, the liabilities described on the Closing Balance Sheet encompassed significant categories of costs, such as notes, mortgage, and accounts payable; accrued expenses and sundry liabilities; accrued taxes; and pensions. (Def. St. ¶12; Pl. Resp. ¶12.)

The Third Circuit in *General Battery* held that this factor of the test was satisfied where the asset purchase agreement provided that the buyer corporation would assume the seller's "contractual obligations and all other obligations appearing on [the predecessor's] balance sheet." 423 F.3d at 308. I similarly conclude that the terms of the 1976 Agreement provide for Cooper's assumption of liabilities ordinarily necessary for the uninterrupted continuation of business.[4]

Turning to the final factor, I must consider whether Wiss ceased ordinary business and dissolved "as soon as practically and legally possible." *Woodrick*, 306 N.J. Super. at 73. The record is somewhat conflicting in this regard.

On the one hand, it is undisputed that Wiss, renamed Fredken, did not manufacture scissors, shears, or snips after the Acquisition. Indeed, there is no evidence in the record that Fredken conducted any manufacturing operations whatsoever. In fact, there is no indication that Fredken conducted any business operations of any kind. (Pl. St. ¶¶14-15; Def. Resp. ¶14-15.)

---

[4]     Cooper's reliance on *Berg Chilling* with respect to this prong of the test is misplaced. There, the asset purchase agreement provided that the buyer corporation acquire all accounts receivable and all contracts related to only one division of the seller's company. 435 F.3d at 470. The buyer did not assume any of the seller's obligations relating to any other division. *Id.* By contrast, the 1976 Agreement provided that Cooper would acquire *all* liabilities and obligations related to Wiss's normal business operations, unless expressly excluded.

Nonetheless, it is clear that Fredken did not formally dissolve until decades after the Acquisition. Unlike the asset purchase agreement in *General Battery*, which expressly required the liquidation and dissolution of the seller as a condition of the transaction, the 1976 Agreement merely prohibited Wiss from engaging in any activity competitive with the hand-tool manufacturing business for a period of five years. (Def. St. ¶22; Pl. Resp. ¶22.) *General Battery*, 423 F.3d at 308. No formal dissolution was required, and no such dissolution occurred until the State of New Jersey revoked Fredken's corporate status on December 16, 2015, for failure to pay annual reports. (Pl. St. ¶18; Def. Resp. ¶18. DE 35-4 Exhibit 16.)

Cooper argues that Wiss "remained an active corporation" under the new name Fredken until 2015. (Def. Mot. 22.) In support of this argument, Cooper points to a short form standing certificate issued by the State Treasury on May 28, 2015, that certifies that Wiss "continue[d] as an active business" as of that date. (DE 36-10, "Short form standing certificate".) The certificate states, however, that annual reports were outstanding from 1988 to 2014. Indeed, Cooper does not dispute that the last annual report that Wiss/Fredken filed with the State was on January 1, 1976. (Pl. St. ¶17; Def. Resp. ¶17.)

Furthermore, the short form standing certificate from 2015 lists "Frederick C.J. Wiss" as the registered agent, despite the fact that, according to a book on the history of Cooper, which was funded and commissioned by the company, Frederick C.J. Wiss died in 1931. (Short form standing certificate; DE 35-4 Exhibit 6.) The certificate also lists the address of the Site as Wiss's registered office, despite the fact that Wiss sold the Site to Cooper as part of the Acquisition. (Short form standing certificate.)

In *General Battery*, the defendant argued that no *de facto* merger occurred because the seller corporation, Price Battery, did not dissolve until over a year after the asset acquisition. 423 F.3d at 308. The Third Circuit disagreed, reasoning that "the more salient fact is that Price Battery immediately ceased ordinary business operations. Within one week of the

16

closing date, Price Battery recast itself as Price Investment Company—a corporate shell that only held cash reserves pending final settlement with [the seller company]. Price Investment had no operations." *Id.* The Third Circuit proceeded to discuss its decision in *Knapp v. N. Am. Rockwell Corp.*, 506 F.2d 361 (3d Cir. 1976), which presented similar facts:

> [In *Knapp,*] we held the seller company dissolved as soon as legally and practically possible. 506 F.2d at 369 . . . . The seller corporation in *Knapp* had "technically continued to exist until its dissolution approximately 18 months after the consummation of the transaction," *id.* at 364, but during that period "it had no substance" and "could not undertake any active operations." *Id.* at 369. As in *Knapp,* "barren continuation" of the seller company does not bar application of the *de facto* merger doctrine. *Id.* at 368. We agree with the District Court that Price Batter ceased operations, liquidated and dissolved as soon as legally and practically possible.

*General Battery*, 423 F.3d at 308.

To be sure, the facts here are different from those in *General Battery* and *Knapp*, as formal dissolution of Wiss did not occur for several decades. But Cooper has produced no evidence to refute PSE&G's assertion, supported by the record, that, following the acquisition, Wiss was nothing more than a barren, corporate shell. That the 1976 Agreement did not expressly require Wiss's dissolution is not dispositive of the issue. As discussed, what occurred in practice is as much evidence of the parties' intent to conduct a merger as what was explicitly provided in the asset purchase agreement. *See Woodrick*, 306 N.J. Super. at 76 ("Even though the Asset Purchase Agreement did not expressly provide for the dissolution of this business, the transaction by its structure . . . contemplated this result. All that remained of Burke was a shell corporation with no ability to pay debts.")

"As recognized under the *de facto* merger doctrine, an essential characteristic of a merger is that one corporation survives while another ceases to exist." *General Battery*, 423 F.3d at 308 (citing *Knapp*, 506 F.2d at 367). The record makes clear that after the Acquisition, Wiss/Fredken continued to exist in name only, while Cooper absorbed Wiss's entire business and survived. It

would elevate form over substance to decide that this "barren continuation" of Wiss/Fredken, even though decades long, renders the *de facto* merger/mere continuation doctrine inapplicable. *See General Battery*, *supra* (quoting *Knapp*, *supra* at 368.). I therefore conclude that Cooper is liable as the successor to Wiss because the two companies effectuated a *de facto* merger, with Cooper functioning as a mere continuation of Wiss.

### C. *PSC Resources*

In addition, and in the alternative, I find that Cooper is liable as successor to Wiss under the *PSC Resources* test. That test requires a showing that (1) Cooper acquired all or substantially all the assets of Wiss for cash and (2) Cooper continued essentially the same operation as Wiss. *PSC Resources*, 175 N.J. Super. at 467.

Cooper does not appear to dispute that it acquired substantially all of Wiss's assets for cash. Cooper argues, however, that it did not continue essentially the same operation as Wiss, particularly because it did not continue using the USTs that are alleged to have caused the contamination that PSE&G complains of. (Def. Mot. 24-29.)

According to Cooper, the dispositive issue under *PSC Resources* is whether the buyer corporation continued the *specific activities* that caused the discharge of hazardous substances. (Def. Opp. 7.) Cooper's reasoning is as follows: The *PSC Resources* test mirrors the product-line exception to the general rule of corporate-successor liability. Under the product-line exception, where a purchasing corporation acquires all or substantially all the assets of a seller corporation and continues essentially the same operation as the seller corporation, the purchaser is strictly liable "for injuries caused by defects in units of the same product line." *Ramirez*, 86 N.J. at 358. Thus, the product-line exception only applies where the purchasing corporation continues to manufacture the same product line that caused the damage. Cooper argues that this requirement exists in parallel form in environmental tort cases, such that the *PSC Resources* test only applies where there is a nexus between the

purchasing corporation's operations and the specific activities that caused the environmental damage.

This argument is bolstered, says Cooper, by the *PSC Resources* decision itself. (Def. Mot. 33.) That court concluded that the buyer corporation continued essentially the same operation as the seller based in part on the following factors: the buyer conducted business at the facility it purchased from the seller using the seller's name; the facility was manned by virtually the same operating personnel; and several members of lower-level management stayed on after the acquisition. 175 N.J. Super. at 467-68. "More importantly, however[,]" was the fact that the buyer "continued the same waste disposal process . . . which is alleged to be the source for the pollution of Oil Lake." *Id.* Cooper argues that unlike the purchaser in *PSC Resources*, it did not continue to use the USTs that are alleged to have leaked fuel oil into the ground.

PSE&G, for its part, emphasizes that *PSC Resources* involved a waste oil reprocessing and refining operation, a necessary component of which is the accumulation and disposal of liquid wastes. *PSC Resources*, 175 N.J. Super. at 450. (Pl. Opp. 25.) Thus, says PSE&G, when the court evaluated whether the buyer continued essentially the same operation as the seller, continuation of the waste disposal process was part and parcel of that inquiry. (*Id.*)

Setting these arguments to the side for the moment, I observe that there is substantial evidence in the record to support a conclusion that Cooper continued to conduct business in essentially the same manner that Wiss did. Cooper retained nearly all of Wiss's employees, including a handful of management personnel; Cooper maintained the same production facilities and physical location; Cooper manufactured the same products, using (for the most part) the same machinery, equipment, and methods that Wiss did; and Cooper used and enforced Wiss's intellectual property rights.

The only legal or factual dispute seems to be over whether Cooper used the specific USTs that Wiss previously utilized and which caused the

environmental damage that PSE&G seeks to hold Cooper liable for.[5] The parties apparently have yet to conduct discovery on this factual issue, so for present purposes the factual dispute is genuine. The legal issue at this juncture, then, is whether that dispute is material, *i.e.*, whether a showing that Cooper continued to use these USTs is essential to support a claim of successor liability under *PSC Resources.*

A plain reading of the broader holding in *PSC Resources* supports a conclusion that such a showing is not necessary. There, the court held that "where the successor corporation acquires all or substantially all the assets of the predecessor for cash and continues essentially the same operation as the predecessor corporation . . . the successor incurs liability for the damages resulting from *any* discharges of hazardous substances by its predecessor." *PSC Resources*, 175 N.J. Super. at 467 (emphasis added). The court's use of the expansive word "any" is not itself dispositive, but it certainly is suggestive.

Further support for this conclusion comes from New Jersey cases applying the product-line exception. These cases make it clear that "[w]hile the successor must undertake essentially the same manufacturing operation, the operation need not be identical." *Potwora ex rel. Gray v. Grip*, 319 N.J. Super. 386, 403–04 (App. Div. 1999) (citing *Bussell v. DeWalt Prod. Corp.,* 259 N.J. Super. 499, 502, 516 (App. Div. 1992), *certif. denied,* 133 N.J. 431 (1993)). For instance, in *Bussell*, the issue was whether the successor could be held liable for injuries caused by a radial arm saw manufactured by a predecessor company. The successor continued to manufacture the radial arm saw, but it made "significant changes" to the product and thus did not manufacture the

---

[5]     At least with respect to the 5,000-gallon UST, Cooper argues not only that it did not use this tank, but also that it did not even acquire it from Wiss, as it was unaware that it existed. Cooper states that the relevant Disclosure Schedules in the 1976 Agreement, which provide an explanation of "all buildings and facilities constituting a part of" the purchased assets and "all machinery and equipment" constituting a part of the purchased assets, do not include this 5,000-gallon UST. (Def. Mot. 6.) Yet, under the terms of the Agreement, Cooper acquired all property "controlled by, related to or used in the business conducted by [Wiss] *wherever situated.*" (Agr. §1.1.) This suggests that Cooper did acquire the tank, regardless of its awareness of the location.

same exact one. *Bussell*, 259 N.J. Super. at 519. The court found it sufficient that the "basic patented idea for the radial arm saw[]" was still in use by the successor, and that a "distinguishing feature of the radial arm saw that injured plaintiff [was] still included in the arm saws produced." *Id.* The takeaway from *Bussell* is that while the successor corporation must continue to manufacture the same *product line* that causes damage, it need not continue manufacture the same exact product in the same exact manner. *See also Potwora*, *supra* at 406 (plaintiff failed to satisfy the product-line test where it put forth no evidence showing that it continued to manufacture a certain line of motorcycle helmets).

Given that the *PSC Resources* test emerged from the product-line exception, it is reasonable to conclude that the two should be construed in parallel. *See Bussell*, 259 N.J. Super. at 518. Construing *PSC Resources* in this manner, it is evident that the facts at hand satisfy the product-line-derived "essentially the same" test.

I note in particular that Cooper used the power drop hammers it had acquired from Wiss, continuing to employ the hot drop-forging process that Wiss had pioneered in 1906. (Pl. St. ¶¶61-62; Def. Resp. ¶¶61-62.) As explained in Cooper's application for ECRA review, which contains a detailed description of Cooper's operations, the drop hammers were "served by an oil fired slot furnace used to heat the steel bar stock raw material to forging temperature (2200˚F) . . . . The fuel oil used to fire the slot furnaces was #2 fuel oil, which was also used to heat the building in the cold months. Four underground fuel oil storage tanks exist on the facility to support fuel oil for these purposes." (DE 35-5 Exhibit 44, Appendix 2.)

Although it is disputed whether Cooper used the specific USTs that PSE&G claims caused the environmental damage, it is sufficient, for purposes of the *PSC Resources* test, that Cooper continued to employ the same forging method that Wiss did, that it utilized USTs to store fuel oil for this purpose, and that fuel oil from USTs is the alleged source of the contamination at issue.

21

In conjunction with the evidence discussed above, this demonstrates that Cooper continued essentially, albeit perhaps not identically, the same manufacturing operation that Wiss conducted.

Cooper argues that the policy considerations underlying the *PSC Resources* test weigh against a finding of successor liability, but I disagree. The relevant policy considerations are three-fold. First, a successor corporation that carries on the enterprise of its predecessor "is in a better position to protect itself and bear the costs of a discharge of pollutants from its facility . . . than would be the public." *PSC Resources*, 175 N.J. Super. at 466. Second, a successor corporation that enjoys the benefits from the reputation and goodwill of the predecessor should also bear the associated burdens. *Id.* at 467. And third, where a successor acquires all or substantially all assets of the predecessor, those harmed by the discharge have no other recourse, as they cannot recover from the predecessor. *Id.* It is fair, then, to impose liability on the successor so that harmed individuals can recover.

In this case, it is evident that Cooper was well-suited to anticipate the environmental damage caused by Wiss's manufacturing operations, to prepare for any resulting liability, and to make improvements in the manufacturing process. That is so even though Cooper was undisputedly not aware of the existence of the 5,000-gallon UST and former oil sump in particular. Cooper was aware of the existence of other USTs utilized by Wiss, and it continued to use those USTs as part of its own manufacturing operations. Cooper also acquired all of Wiss's information relating to its manufacturing processes and was thus able to anticipate the associated risks.

It also apparent that Cooper benefitted substantially from its use of the Wiss name. For nearly 20 years after the Acquisition, Cooper continued to manufacture Wiss products and advertise them as such, holding itself out as a continuation of Wiss. (Pl. St. ¶¶104-106; Def. Resp. ¶¶104-106.) Having benefited from Wiss's good will and industry reputation, Cooper "should also be

made to bear the burden of the operating costs that other established business operations must ordinarily bear." *Ramirez*, 86 N.J. at 353.

Finally, as discussed in Part IV.B, *supra*, Wiss was merely a shell of a corporation by the time PSE&G discovered the environmental contamination. Because Cooper's acquisition of Wiss left PSE&G without a remedy against Wiss, Cooper should step into Wiss's shoes.

These policy considerations support a conclusion that Cooper is liable as the successor to Wiss under the *PSC Resources* test.

## V.    Conclusion

For the reasons set forth above, PSE&G's motion for partial summary judgment (DE 35) is **GRANTED** and Cooper's motion for partial summary judgment (DE 36) is **DENIED**. Cooper, as corporate successor to Wiss, may be held liable for any discharge of hazardous material by Wiss. An appropriate order will issue.

Dated: June 26, 2023

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**

23